**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**CAROLE ANNE SMITH,**

               **Plaintiff,**

     **v.**

**UNITED STATES DEPARTMENT**
**OF HOMELAND SECURITY et al.,**

               **Defendants.**

**8:12-cv-1087**
**(GLS/TWD)**

**APPEARANCES:**             **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Carole Anne Smith
Pro Se
72 Balsam Street
Lake Placid, NY 12946

**FOR THE DEFENDANTS:**
HON. GRANT C. JAQUITH     KAREN FOLSTER
United States Attorney         LESPERANCE
445 Broadway, Room 218     Assistant U.S. Attorney
Albany, NY 12207

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff *pro se* Carole Ann Smith commenced this action against the United States Department of Homeland Security Transportation Security Administration (TSA) and various TSA employees.  (*See generally* Compl., Dkt. No. 1; Am. Compl., Dkt. No. 11.)  Her remaining claims are for religious discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act (Title VII)[1] against the TSA.  (Am. Compl.; Dkt. No. 31 at 2, 8.)  Pending is the TSA's motion for summary judgment. (Dkt. No. 45.)  For the reasons that follow, the motion is granted.

### II. Background

**A.    Facts**[2]

Smith began employment with the TSA as a probationary-status Transportation Security Officer (TSO) in July 2008.  (Def.'s[3] Statement of Material Facts (SMF) ¶ 1, Dkt. No. 45, Attach. 3.)  On August 4, 2008—her

---

[1] *See* 42 U.S.C. §§ 2000e-2000e-17.

[2] Unless otherwise noted, the facts are undisputed.

[3] As explained below, *see infra* Part IV.A, Janet Napolitano's successor is dismissed as a defendant, leaving the TSA as the sole defendant.

first day reporting to the airport[4] for duty after completing a two-week course that included training on the importance of being on time—Smith was late to work and was counseled for tardiness. (*Id.* ¶¶ 2-4.)[5] Smith was also counseled that day for removing a medical device from a checked bag during a screening and then failing to return the device to the bag. (*Id.* ¶¶ 6-7.) Later that month she was counseled for displaying her personal cellphone while working at a checkpoint, and she was counseled again in October for being out of uniform. (*Id.* ¶¶ 8-9.) Smith was counseled again in November for leaving her post without permission and returning late from break. (*Id.* ¶ 10.)

When Smith first began her employment as a TSO, she was assigned an on-the-job mentor, TSO Mary Bagnoli. (*Id.* ¶ 12.) Smith claims that Bagnoli "intimidated and harassed [her]." (Am. Compl. ¶ 10.) On one occasion, after Smith improperly swabbed the lens of a disposable camera and drew a complaint from its owner, Bagnoli brought her into a private screening room and made her read the standard operating

---

[4] Albany International Airport in Albany, New York. (Am. Compl. ¶ 10.)

[5] Smith does not deny her tardiness but instead offers an excuse for why she was late. (Dkt. No. 47 at 3.) This is typical of her response to the TSA's statement of material facts, in which she offers excuses but not denials. (*See generally id.*)

3

procedure regarding cameras.  (Def.'s SMF ¶ 14; Am. Compl. ¶ 10.)[6]

Smith asked to be reassigned to a different mentor, and her request was

granted.  (Def's SMF ¶ 13.)[7]

On December 5, 2008, Smith sent an e-mail to Federal Security

Director (FSD) Brian Johansson containing a number of complaints about

her working relationship with Bagnoli.  (*Id.* ¶ 11.)  In addition to the

aforementioned camera incident, Smith complained that Bagnoli verbally

attacked her regarding a proposal to offer massage services in the TSO

break room.  (*Id.* ¶¶ 14-15.)  Smith's e-mail also alleged that Bagnoli "does

not even allow me to talk to anyone without her making a comment or

literally pulling them away" and that Bagnoli and "her clique . . . are loud

and very vulgar."  (Dkt. No. 45, Attach. 8 at 1; Def.'s SMF ¶¶ 16-17.)  In

February 2009, Smith contacted the TSA's ombudsman to complain about

alleged harassment that she felt resulted from her request for a new

mentor.  (Def.'s SMF ¶ 24.)  The concerns that Smith expressed to the

---

[6] Smith alleges that Bagnoli's "then live[-]in boyfriend and [s]upervisor" was also present.  (Am. Compl. ¶ 10.)

[7] Smith was reassigned to TSO Dorothy Tompkins, whom she got along with well. (Dkt. No. 45, Attach. 6 at 28-30, 146.)

ombudsman were primarily with the way that she was being treated by Bagnoli and her "clique." (*Id.* ¶ 25 (internal quotation marks omitted).)

On January 26, 2009, Smith was counseled about excessive use of sick leave and how she frequently used it on days connected to her scheduled days off. (*Id.* ¶ 23.)  Less than a month later, Smith was counseled not to approach other TSOs in a rude or demeaning tone. (*Id.* ¶ 26.)  On February 23, a Supervisory Transportation Security Officer (STSO) observed Smith crying and brought her to the supervisor's office. (*Id.* ¶ 27.)  Smith explained that she was "tired of being accused of reporting stuff to the FSD," (*id.* ¶ 28 (internal quotation marks omitted)), and that she was "constantly questioned" regarding her analysis of x-ray images, (*id.* ¶ 30; Dkt. No. 47 at 5).  She also said that "at a pizza luncheon, TSO Michelle Rodriguez looked directly at her and then made a comment to other TSO[s] to watch what they say, or it might get reported to the FSD." (Def.'s SMF ¶ 29.)

On or around March 2, Smith submitted a written complaint to management, which detailed incidents involving Bagnoli and Rodriguez that occurred between February 22 and March 2. (*Id.* ¶ 32.)  In that complaint, she indicated that Bagnoli was treating her worse than before,

because Bagnoli mistakenly believed that she had asked to be removed

from a baggage machine where Bagnoli would have been her mentor.  (*Id.*

¶ 33.)  The complaint also contends that Rodriguez called her a "snake"

and told co-workers to be careful what they say around her because she

might e-mail the FSD.  (*Id.* ¶ 34 (internal quotation marks omitted).)  Smith

believed that she was being treated badly because of rumors that she had

been e-mailing Johansson and putting anonymous comments in the

suggestion box.  (*Id.* ¶ 35.)

On March 4, Bagnoli told Assistant FSD Matthew Lloyd that she felt

threatened by Smith.  (*Id.* ¶ 36.)  Part of the reason that Bagnoli felt

threatened was because of Smith's religion, Wicca[8]; another reason was

that Smith allegedly followed Bagnoli as the two drove home from work.

(Dkt. No. 47 at 5; Dkt. No. 49, Attach. 1 at 35, 54-55, 75.)  As the

workplace violence coordinator, Lloyd was primarily concerned with

ensuring that neither employee was a threat to the other.  (Def.'s SMF

¶ 37.)  Thus, on March 4, Lloyd sent an e-mail to supervisors and

managers indicating that a "situation exist[ed]" between Bagnoli and Smith,

---

[8] Although the details of Smith's faith are unclear—and irrelevant for purposes of this motion—Wicca has been described as "a neo-pagan, polytheistic, and pantheistic faith based on beliefs that predate Christianity."  *Knowles v. Pfister*, 829 F.3d 516, 518 (7th Cir. 2016).

and the two employees should be separated "to the largest extent possible," while a preliminary inquiry was conducted.  (*Id.* ¶ 39 (internal quotation marks omitted).)  After concluding that the situation did not present a workplace violence issue, Lloyd never sent an e-mail changing the separation directive, as he left it to other managers to determine what to do.  (Dkt. No. 49, Attach. 1 at 37, 49-51, 53, 71-72.)

On March 5, Training Coordinator Nick Morano wrote a memorandum documenting negative behavior by Smith during a training instruction.  (Def.'s SMF ¶ 41.)  Morano had arranged for a ninety-minute assessment of Smith in a live baggage situation, and Smith did not perform to standard in two areas.  (*Id.* ¶¶ 42-43.)[9]  When given corrective feedback, Smith responded that she intended to visit her doctor that evening in order to be put on light duty so that she would not have to work in checked baggage anymore.  (*Id.* ¶¶ 43-44; Dkt. No. 45, Attach. 7 at 38.)  Smith instructed Morano to direct all future communication to her through her legal counsel and attempted to leave the room before the meeting was concluded.  (Def.'s SMF ¶¶ 45, 47.)  When told she would have to

---

[9] Smith alleges that Bagnoli supervised and acted as her mentor during this assessment.  (Dkt. No. 47 at 5.)  However, Morano's memorandum details how a different individual (Pam Wiersma) assessed Smith; Bagnoli is only mentioned as being Smith's mentor on the previous weekend.  (Dkt. No. 45, Attach. 7 at 38.)

complete additional training and be reassessed, Smith stated that it would not matter because she would not be working in checked baggage anymore. (*Id.* ¶ 48; Dkt. No. 45, Attach. 7 at 38.)

Later that night, Smith e-mailed Johansson from a personal e-mail address to describe what had happened with the assessment. (*Id.* ¶ 49.) Smith believed that the training assessment happened because Bagnoli was upset that Smith had refused to mentor with her. (*Id.* ¶ 50.) Johansson e-mailed another TSA employee, "I am not going to address her issues . . . she has chosen her path," because Smith "decided to go to the [o]mbudsman." (Dkt. No. 45, Attach. 13 at 1.) Johansson did not view anything that Smith reported to him as a complaint of religious harassment or discrimination. (Def.'s SMF ¶ 51.)

On March 10, Bagnoli submitted a written complaint stating that Smith had followed her on her drive home. (*Id.* ¶ 53.) Two days later, Lloyd called Smith into his office to discuss the complaint. (*Id.* ¶ 54.) He told Smith that "a perception of fear was expressed by . . . Bagnoli as it pertains to Smith practicing witchcraft and being a self-professed witch." (*Id.* ¶ 56 (internal quotation marks omitted).) Smith responded that she practiced Wicca, which is a recognized religion and not witchcraft. (*Id.*

¶ 57.)  Lloyd "responded that [workplace mediation] was a particularly good venue to dispel misconceptions and falsehoods promulgated about her religious practices and provided a forum to resolve personality conflicts between [Bagnoli and Smith]."  (Dkt. No. 45, Attach. 7 at 41.)  Smith declined to participate in mediation because she did not want to have to defend her religion.  (*Id.*; Dkt. No. 47 at 6.)  During the meeting, Smith left the room twice, and Lloyd had to recall her back to his office to conclude the interview.  (Def.'s SMF ¶ 60.)  Smith contends that this was because Lloyd asked her to explain her religion to Bagnoli.  (Dkt. No. 45, Attach. 9 at 9; Attach. 15 at 2-3.)

In March 2009, Smith received counseling for two different incidents. The first was for failing to check a boarding pass after she allowed a passenger who had not presented one to enter a secure area.  (Def.'s SMF ¶ 52.)  The second was for tardiness.  (*Id.* ¶ 61.)  On April 30, Smith submitted a written statement reporting what she perceived to be security breaches by an STSO, including that he frequently walked around with an open pen in his mouth, which looks bad and "is a dangerous thing to do around so many people."  (*Id.* ¶ 63 (internal quotation marks omitted).)

Smith alleges that her statement caused "more retaliation from even more people." (Am Compl. ¶ 19.)

On May 11, Transportation Security Manager Jack Engelhardt issued Smith a letter of reprimand for her "unprofessional and inappropriate conduct" and "insubordinate behavior" at a checkpoint on April 10, (Def.'s SMF ¶ 62 (internal quotation marks omitted)), which included swearing at fellow officers and threatening to leave the checkpoint, (Dkt. No. 45, Attach. 16 at 1, 5). Smith was also counseled on May 11 for leaving her post and leaving the baggage screening room unattended in order to get a snack. (Def.'s SMF ¶ 64.)

On June 2, 2009, Engelhardt wrote a report summarizing Smith's work history, which included five verbal counselings, four written general counselings, and one letter of reprimand. (*Id.* ¶ 66.) The June 2 report recommended "severe disciplinary [action] up to and including removal" from her position. (*Id.* (internal quotation marks omitted).) On June 18, the TSA terminated Smith's probationary employment, citing inappropriate conduct and lack of dependability throughout her employment. (*Id.* ¶ 67.) The termination letter, issued by acting FSD Patricia Sykes, lists thirteen violations of agency rules and regulations for which Smith had been

10

counseled in less than nine months, from August 25, 2008 to May 11, 2009.  (*Id.* ¶ 68.)[10]

## B.   <u>Procedural History</u>

On October 2, 2009, Smith filed an Equal Employment Opportunity (EEO) complaint and timely requested a hearing, which was held before an Administrative Judge (AJ) on November 30, 2010.  (Am. Compl. at 7-8.) After the hearing, the AJ issued a decision finding no discrimination, which was affirmed by the EEO Commission (EEOC) on April 20, 2012.  (*Id.* at 10, 11.)

Smith filed the instant action on July 9, 2012.  (Compl.)  The court adopted Magistrate Judge Thérèse Wiley Dancks' Report Recommendation and Order, (Dkt. No. 5), which granted Smith's motion for leave to proceed *in forma pauperis*, (Dkt. No. 2), and, pursuant to 28

---

[10] In response to Def.'s SMF ¶¶ 67-68, Smith wrote: "Answered by reference [to] EEOC testimony[.]"  (Dkt. No. 47 at 6.)  Thus, Smith failed to comply with N.D.N.Y. L.R. 7.1(a)(3) because she did not set forth a specific citation to the record where the factual issue arises. Although "cognizant of the special solicitude afforded to *pro se* plaintiffs, the court notes that Rule 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Clark v. N.Y.S. Office of State Comptroller*, No. 1:09–cv–716, 2014 WL 823289, at *1 n.8 (N.D.N.Y. Mar. 3, 2014) (internal quotation marks and citation omitted).  Nevertheless, the court has thoroughly reviewed the record and considered Smith's disputed facts.  *See id.*  To the extent that there is nothing in the record to rebut a properly-supported fact within the TSA's statement of material facts, such facts are deemed admitted.  *See id.*

U.S.C. § 1915(e), dismissed Smith's complaint with leave to amend, (Dkt. No. 9).

On March 1, 2013, Smith filed an amended complaint against the TSA and former U.S. Secretary of Homeland Security Janet Napolitano,[11] alleging violations of Title VII, Title I of the Americans with Disabilities Act (ADA),[12] and the Rehabilitation Act.[13]  (*See generally* Am. Compl.)  On April 28, 2015, the court granted the TSA's partial motion to dismiss and dismissed Smith's ADA and Rehabilitation Act claims, leaving only her Title VII claims.  (Dkt. No. 31.)[14]  Smith's remaining Title VII claims are for (1) discrimination, (2) hostile work environment, and (3) retaliation.[15]  (Am. Compl. ¶¶ 6-7.)

---

[11] The Clerk is directed to substitute Kirstjen M. Nielsen, current U.S. Secretary of Homeland Security, for defendant Janet Napolitano and amend the caption accordingly.  *See* Fed. R. Civ. P. 25(d).

[12] *See* 42 U.S.C. §§ 12111-17.

[13] *See* 29 U.S.C. §§ 701-796l.

[14] The TSA did not seek to dismiss Smith's Title VII claims.  (Dkt. No. 31 at 2 n.4.)

[15] In her response to the TSA's motion for summary judgment, Smith, for the first time, insinuated that she was a "'whistleblower.'"  (Dkt. No. 47 at 1-2.)  For the reasons given by the TSA in its reply, (Dkt. No. 50 at 8), and because Smith's reference to being a whistleblower is conclusory and devoid of any support, (Dkt. No. 47 at 1-2), the court grants summary judgment on such a whistleblower claim to the extent that it was even brought in the first place.

Pending is the TSA's motion for summary judgment as to Smith's remaining claims.  (Dkt. No. 45.)

## III.  Standard of Review

The standard of review pursuant to Federal Rule of Civil Procedure 56 is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

## IV.  Discussion

### A.    Defendant Kirstjen M. Nielsen

Kirstjen M. Nielsen is dismissed from this case.  To begin with, Smith's amended complaint does not make any allegations whatsoever regarding Janet Napolitano, former U.S. Secretary of Homeland Security.[16] (*See generally* Am. Compl.)  Moreover, "individuals are not subject to liability under Title VII."  *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (internal quotation marks and citation omitted).  And even if Smith's claims are construed against the Secretary in her official capacity, "Title VII . . . do[es] not provide for suits against individuals in their official

---

[16] *See supra* n.11.

13

capacity" where, as here, the employer entity has been named as a defendant.  *Griffith v. N.Y. State Dep't of Health*, No. 1:14–cv–1128, 2015 WL 4545991, at *6 (N.D.N.Y. July 28, 2015) (internal quotation marks and citation omitted) (collecting cases); *see Boyd v. Broome Cmty. Coll.*, No. 3:14–CV–0397, 2015 WL 6962498, at *6 (N.D.N.Y. Nov. 10, 2015).

**B.    Smith's Title VII Discrimination Claim**

Under Title VII, it is "unlawful . . . for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).  Discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework, which places upon the plaintiff the initial burden of making out a prima facie case of discrimination.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  To satisfy that burden, the plaintiff "must show: (1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an

14

inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (internal quotation marks and citation omitted).

"A plaintiff's establishment of a *prima facie* case gives rise to a presumption of unlawful discrimination . . . that shifts the burden of production to the defendant, who must proffer a legitimate, non-discriminatory reason for the challenged employment action." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (internal quotation marks and citation omitted). "If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case[.]" *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). At that point, "[t]o avoid summary judgment . . . the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Id.* (internal quotation marks and citation omitted). "[H]owever, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.* at 137.

Here, Smith cannot meet the fourth element of her prima facie case—i.e., that she was terminated under circumstances giving rise to an

inference of discriminatory intent.  *See Brown*, 673 F.3d at 150.  Smith was terminated for inappropriate conduct and lack of dependability.  (Def.'s SMF ¶ 67.)  Smith's termination letter, issued by acting FSD Patricia Sykes, lists thirteen violations of agency rules and regulations for which Smith had been counseled in less than nine months.  (*Id.* ¶ 68.)[17]

Smith has not presented any evidence to infer that her termination had anything to do with her religion.  Indeed, regarding the incidents listed in her termination letter, at deposition Smith was asked: "For any one of those incidents of counseling, do you have a reason to believe that the reason that the supervisor who counseled you decided to counsel you was because of discrimination on the basis of your religion?"  (Dkt. No. 45, Attach. 6 at 42.)  Smith replied, "No."  (*Id.*)  When questioned about specific incidents for which she was terminated, Smith admitted that she had no reason to believe that those who counseled her did so on the basis of her religion.  (Dkt. No. 45, Attach. 2 at 15-17.)

The only incidents listed as bases for terminating Smith that had anything at all to do with her religion are 1) the conflict mitigation measure

---

[17] The June 2, 2009 report summarizing Smith's work history and recommending her termination was drafted by Engelhardt, (Def.'s SMF ¶ 66), whose affidavit states that he was never aware of Smith's religion, (Dkt. No. 45, Attach. 22 at 2).

to keep Bagnoli and Smith apart and 2) her meeting with Lloyd, during

which she left the room twice and had to be instructed to return.  (Dkt. No.

45, Attach. 7 at 2.)  Regarding the former, Smith contends that when

Bagnoli told Lloyd that she felt threatened by Smith, it "was based fully on

[her] religion."  (Dkt. No. 47 at 5.)  But even if true,[18] this fact is not

material.  Bagnoli was not a manager and had no role in Smith's

termination.  *See Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 115 (2d Cir.

2007) (holding remarks by someone other than decision-maker "may have

little tendency to show that the decision-maker was motivated by the

discriminatory sentiment expressed in the remark"), *abrogated on other*

*grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *Louis v.*

*Brooklyn Botanic Garden*, No. 10–CV–5406, 2011 WL 3857127, at *8

(E.D.N.Y. Sept. 1, 2011) (holding "offensive statements of . . . employees

who had no role in [plaintiff]'s termination are poor proof that discrimination

motivated [that] termination"), *aff'd sub nom. Louis v. Brooklyn Botanic*

*Gardens*, 487 F. App'x 603 (2d Cir. 2012).  Even drawing all reasonable

---

[18] Lloyd's EEOC hearing testimony—the only support that Smith references—describes
how Bagnoli's fear was based in part on Smith's religion but also on Smith following her home.
(Dkt. No. 49, Attach. 1 at 35, 54-61, 75, 77-78).  And there was clearly conflict between
Bagnoli and Smith that had nothing to do with Smith's religion.  (Def.'s SMF ¶¶ 11-17; Dkt No.
45, Attach. 6 at 56.)

inferences in favor of Smith, the connection between her co-worker's opinion of her religion and her termination is too tenuous to constitute evidence from which a reasonable jury could infer discriminatory intent. *See Fenner v. News Corp.*, No. 09 Civ. 09832, 2013 WL 6244156, at *20 (S.D.N.Y. Dec. 2, 2013); *Saucier v. Edgewater Const. Co.*, No. 92-CV-1111, 1994 WL 36363, at *4 n.9 (N.D.N.Y. Feb. 4, 1994).

Similarly, the reason why Smith left her meeting with Lloyd is inconsequential. During her March 12, 2009 meeting with Lloyd, Smith contends that she was upset and left the room because Lloyd asked her to explain her religion to Bagnoli. (Dkt. No. 45, Attach. 9 at 9; Attach. 15 at 2-3.) Lloyd told Smith "that [workplace mediation] was a particularly good venue to dispel misconceptions and falsehoods promulgated about her religious practices[.]" (Dkt. No. 45, Attach. 7 at 41.) But even accounting for the impropriety, ignorance, and insensitivity of such a statement, it is not evidence on which one can infer that Smith's termination was discriminatory. At best it is proof that Smith was justified in leaving the room twice, Lloyd misperceived her actions as insubordination, and the incident should not have been listed in her termination letter. But the connection to Smith's religion is far too tenuous, *see Fenner*, 2013 WL

18

6244156, at *20, and, as with Bagnoli, Lloyd had no role in Smith's termination, (Dkt. No. 45, Attach. 12 at 7); *see Tomassi*, 478 F.3d at 115; *Louis*, 2011 WL 3857127, at *8.

The court is mindful of the "need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Holcomb*, 521 F.3d at 137. And, as a *pro se* litigant, the court must read Smith's pleadings "liberally and interpret them to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks and citation omitted). But Smith cannot defeat a motion for summary judgment by relying on her allegations. *See Belpasso v. Port Auth. of N.Y. and N.J.*, 400 F. App'x 600, 601 (2d Cir. 2010). Here, aside from Smith's unsupported conclusions, there is nothing from which a reasonable jury could infer that her termination was discriminatory. *See Holcomb*, 521 F.3d at 137. And, even if Smith did establish a prima facie case, as explained above, the TSA had a gamut of legitimate, non-discriminatory reasons to terminate her, including a verbal outburst at her managers and abandoning her post on multiple occasions. (Dkt. No. 45, Attach. 7 at 1-2.) Smith has set forth no evidence to show that religious

19

discrimination was a motivating factor for her termination, and she cannot

resist summary judgment.  *See Holcomb*, 521 F.3d at 137, 138; *Granger v.*

*N.Y.C. Transit Auth.*, 712 F. App'x 119, 121 (2d Cir. 2018).[19]

## C.   Smith's Title VII Hostile Work Environment Claim

> In order to establish a hostile work environment claim under Title
> VII, a plaintiff must produce enough evidence to show that the
> workplace is permeated with discriminatory intimidation, ridicule,
> and insult, that is sufficiently severe or pervasive to alter the
> conditions of the victim's employment and create an abusive
> working environment.

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir.

2014) (internal quotation marks, footnote, and citation omitted).  "In

considering whether a plaintiff has met this burden, courts should

examin[e] the totality of the circumstances, including: the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with the victim's [job] performance."  *Id.* (internal quotation marks

---

[19] Smith did not allege that she suffered an adverse employment action besides termination.  *See McDonnell Douglas*, 411 U.S. at 802.  That is, besides termination, she did not suffer "a materially adverse change in the terms and conditions of employment."  *Sanders v. N.Y.C. Human Res. Admin*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks and citation omitted).  The coordinated scheduling of breaks and meal times so that Bagnoli and Smith would not be on break at the same time, (Def.'s SMF ¶ 40), was not "more disruptive than a mere inconvenience" and is not an adverse employment action.  *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks and citation omitted); *see Ferrer v. Potter*, No. 03 Civ. 9113, 2005 WL 1022439, at *9 n.8 (S.D.N.Y. May 3, 2005) (holding transfer to another location is not an adverse employment action).

and citation omitted).  "Moreover, the test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id.* (internal quotation marks and citation omitted).

"[I]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through [other means], is actionable under Title VII only when it occurs *because of an employee's . . . protected characteristic*," such as religion.  *Id.* (internal quotation marks and citation omitted); *see Marshall v. N.Y.C. Bd. of Elections*, 322 F. App'x 17, 18-19 (2d Cir. 2009) (affirming district court's grant of summary judgment on plaintiff's hostile work environment claim because although plaintiff's "allegations that her supervisor displayed a violent temper, stood over her with clenched fists on several occasions, disparaged her educational background, and engaged in crass behavior are troubling," Title VII "prohibits only harassment that is discriminatory") (internal quotation marks and citation omitted).

Smith cannot establish that the actions allegedly resulting in a hostile work environment were related to her religion.  (Dkt. No. 45, Attach. 2 at

19.)  Much of her complaint revolves around a clearly acrimonious

relationship with Bagnoli and Rodriguez.  (*See, e.g.*, Am. Compl. ¶¶ 10,

13.)  Smith's relationship with Bagnoli soured very early in Smith's

employment with the TSA, well before Bagnoli ever even knew that Smith

was Wiccan.  (Def.'s SMF ¶¶ 11-18, 21.)  Other than the instances

described below, Smith has failed to set forth facts indicating that the

alleged harassment and intimidation that she suffered from Bagnoli and

Rodriguez were in any way motivated by a religiously-based discriminatory

animus.  (Dkt. No. 45, Attach. 6 at 56-59.)[20]

Smith alleges two instances involving Bagnoli that are related to her

religion; first, that Bagnoli complained that Smith put a spell on the heater

of her car, (*id.* at 57), and second, one occasion of overhearing people

saying that Bagnoli was afraid of Smith casting spells on her and her

family, (*id.* at 57-59).  Regarding the latter instance, Smith testified that she

did not remember whom she overhead, did not report the occasion to

---

[20] Notably, Smith's reported complaints concerning Bagnoli had nothing to do with
religion.  (Def.'s SMF ¶¶ 11, 14-19, 28, 32-35; Dkt. No. 45, Attach. 6 at 64.)  Smith believed
Bagnoli and Rodriguez treated her poorly because of their clique, (Def.'s SMF ¶¶ 17, 25),
because Smith e-mailed Johansson and put comments in the suggestion box, (*id.* ¶ 35), and
because Bagnoli mistakenly believed Smith asked to be removed from working with her, (*id.*
¶ 33).  Nothing in Smith's complaints to Johansson, (Dkt. No. 45, Attachs. 8, 13), mentioned
anything about religion or discrimination because of a protected class, and Johansson did not
view anything Smith reported to him as a complaint of religious harassment or discrimination,
(Def.'s SMF ¶ 51).  Nor did Smith herself.  (Dkt. No. 45, Attach. 6 at 64.)

anyone, and "didn't see it as being important."  (*Id.* at 58-59.)  With respect

to Bagnoli's complaint about her heater, it was in conjunction with an

allegation that Smith followed Bagnoli home the prior night.  (Def.'s SMF

¶ 53).  Written statements were taken from both parties, (Dkt. No. 45,

Attachs. 14, 15), and, as a safety matter, Bagnoli and Smith were

separated to the largest extent possible, (Dkt. No. 45, Attach. 7 at 37).

Workplace mediation was also suggested—albeit in an uncouth and

unseemly manner, (*id.* at 41)—and the issue did not recur.  These two

instances are not "sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment."

*Rivera*, 743 F.3d at 20 (internal quotation marks and citation omitted).

     The only other alleged conduct related to Smith's religion is that after

March 2009 "[p]eople were making jokes and asking . . . questions about

[Smith's] religion[.]"  (Dkt. No. 45, Attach. 6 at 79-80; Attach. 9 at 8.)  Her

co-workers made comments like: "Did you ride your broom in today?

Where is your pointed hat?  Are you anything like a wizard?  Maybe you

should bring your black hat and your cape.  Stuff like that."  (Dkt. No. 45,

Attach. 6 at 44.)  Smith testified that it was "dumb stuff" and "annoying" but

was not malicious; the comments did not interfere in any way with her

ability to get her job done.  (*Id.* at 80, 83.)  Smith was told that one co-worker by the name of Joe (last name unknown) said that he was afraid that she would "put a hex on him."  (*Id.* at 38, 73-75.)  Others asked her questions about Wicca and what her belief system was, which she thought might be motivated by curiosity.  (*Id.* at 80-82.)  She answered the questions, which were not demeaning or derogatory, and they did not make her feel uncomfortable.  (*Id.*)

Such isolated comments and questions by co-workers are the type of stray remarks that are insufficient to create a hostile work environment because they are not sufficiently severe or pervasive to alter the terms and conditions of employment.  *See Baron v. Winthrop Univ. Hosp.*, 211 F. App'x 16, 17 (2d Cir. 2006).  "Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment."  *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004).  As is the case here, "[c]onduct that is merely offensive, unprofessional, or childish cannot support a hostile work

environment claim." *Payton v. City Univ. of N.Y.*, 453 F. Supp. 2d 775, 785 (S.D.N.Y. 2006) (internal quotation marks and citation omitted).[21]

## D.   Smith's Title VII Retaliation Claim

A plaintiff claiming retaliation under Title VII must allege: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) adverse employment action; and (4) a causal connection between plaintiff's protected activity and the adverse employment action." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 113 (2d Cir. 2000).

A retaliation claim is analyzed under the burden-shifting framework from *McDonnell Douglas* but with a different last step than a discrimination claim. *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015). For a retaliation claim, the plaintiff bears the initial burden to establish a prima facie case of retaliation by offering evidence that she "participated in a protected activity," "suffered an adverse employment action," and "that there was a causal connection between her engaging in the protected activity and the adverse employment action." *Id.* (internal

---

[21] The TSA also argues that Smith failed to timely exhaust administrative remedies regarding her hostile work environment claim. (Dkt. No. 45, Attach. 2 at 17-18.) Because summary judgment is granted for the TSA on the merits of that claim, it is unnecessary to reach this issue.

quotation marks and citation omitted). This showing creates a "presumption of retaliation," which the defendant may rebut by "articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (internal quotation marks and citation omitted). If the defendant provides such an explanation, "the presumption of retaliation dissipates," and the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (internal quotation marks and citation omitted).

As explained above, the only alleged adverse employment action is Smith's termination. *See supra* n.19.[22] Also explained above is that the TSA had an array of legitimate, non-retaliatory reasons to terminate Smith for inappropriate conduct and lack of dependability. (Dkt. No. 45, Attach. 7 at 1-2; Def.'s SMF ¶¶ 67-68.) No reasonable jury could conclude that the desire to retaliate was the but-for cause of the TSA's termination of Smith, and thus summary judgment is appropriate on her retaliation claim. *See Ya-Chen Chen*, 805 F.3d at 73.

---

[22] The fact that Johansson e-mailed another TSA employee, "I am not going to address her issues . . . she has chosen her path," because Smith "decided to go to the [o]mbudsman," (Dkt. No. 45, Attach. 13 at 1), is not an adverse employment action. Although unprofessional and arguably petty, Johansson's abdication was not a materially adverse change in the terms and conditions of Smith's employment. *See Sanders*, 361 F.3d at 755.

**E.**     **Smith's Responses to the TSA's Motion for Summary Judgment**

Smith argues that she was "in [the] top 5% of TSA Albany," a "fact confirmed in the EEOC testimony of [Engelhardt]," without giving any citation. (Dkt. No. 47 at 1.) A thorough review of the EEOC testimony provided by Smith, (Dkt. No. 49, Attach. 1), however, reveals that nothing of the sort was mentioned. She also argues that she "can prove retaliation based on sworn testimony of [the] TSA['s] management at the EEOC hearing." (Dkt. No. 47 at 2.) Again, a thorough review of the testimony, (Dkt. No. 49, Attach. 1), refutes that. Tellingly, Smith also contends that "[she] [is] not sure why" she experienced the treatment she alleges while working for the TSA, which undercuts her claims that she was discriminated against on the basis of her religion. (Dkt. No. 51 at 2.[23]) Additionally, Smith argues that "as a human being, we should all be protected from bullies in the workplace." (*Id.* at 3.) However accurate that

---

[23] Smith submitted a second response, (Dkt. No. 51), after the TSA filed their reply, (Dkt. No. 50), to Smith's initial response, (Dkt. No. 47). As Smith is a *pro se* litigant, the court fully considered Smith's second response. *See Osby v. City of New York*, 13-cv-8826, 2017 WL 4236563, at *6 (S.D.N.Y. Sept. 22, 2017).

sentiment may be, under the facts presented and the applicable law, summary judgment for the TSA is appropriate in this case.[24]

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the Clerk substitute Kirstjen M. Nielsen for defendant Janet Napolitano and amend the caption accordingly; and it is further

**ORDERED** that the TSA's motion for summary judgment (Dkt. No. 45) is **GRANTED**; and it is further

**ORDERED** that Smith's amended complaint (Dkt. No. 11) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

March 30, 2018
Albany, New York

Gary L. Sharpe
U.S. District Judge

---

[24] Smith also argued that the TSA did not interview Tompkins, Bagnoli, "and a few of my other former co workers" who would confirm her claims.  (Dkt. No. 47 at 6.)  And in her second response, Smith argued that she is not an attorney and expressed the difficulty in conducting depositions.  (Dkt. No. 51 at 1.)  However, Smith filed two motions to appoint counsel, (Dkt. Nos. 3, 25), both of which were carefully considered and properly denied by Magistrate Judge Thérèse Wiley Dancks, (Dkt. No. 5 at 6; Dkt. No. 26).